Judges, it's an honor to meet you. How much time would you like to reserve for rebuttal? Um, it depends on how much time my speech takes. I haven't had a chance to time it out. Um, probably at least five minutes. Five minutes. Okay. Go ahead, please. Okay. Um, my name is J.C. Flores and I represent appellant Tanjila Islam, who I'll call defendant because it's easier for me, or she. Um, I'd like to think of myself as the best lawyer a bankrupt person can buy. Can you still hear me? Oh my goodness. Yes, we can hear you. Um, this is what I would call a hell half no fury, like a creditor scorn case, because prior to this appeal, plaintiff has spent upward of $400,000, uh, to chase $253,000 in remaining principal in this matter. Um, this matter involves a simple breach of contract and nothing more. Plain, fraud or anything non-dischargeable in a bankruptcy. Uh, in this matter, defendant personally guaranteed a promissory note for about $506,000 for her wholly owned company, Tiger Trade Services, which I'll call Tiger Trade. Let me, let me interrupt you for a second and kind of cut to what I think is the central question on this part of your case. I mean, the court held a trial and found basically that your client made a promise that she did never intended to keep. And that's, that's a finding of fact that we review for clear error. Don't, isn't that true about the standard review? Um, I, whatever I wrote in my appellate brief, which was a while ago, um, um, would be my opinion. Well, you have to, you have to, what I'm saying is you have a, a pretty high hurdle to get over to convince us that that finding about your client's intention was wrong. So please focus on that, that part of the case. Well, he, he also found that she intended to repay the note. Um, and, um, yes, I, I think there was clear error because he made a dispositive holding that certain goods were worthless and that was dispositive. And then he didn't allow expert rebuttal testimony to show that they weren't worthless. And these same goods that were used to offer, uh, uh, in lieu of monetary payment, um, were still being dealt with by the Mexican buyers. We were calling them. Um, I don't know if you're following me at all. Hopefully you are. Um, eight months later, they were still dealing with it. Um, so it's a clear error to find that these goods were worthless. Um, I think it was a clear error and the expert witness would have rebutted that. Is that, is that the issue though? I mean, whether the goods are worthless, does that really matter? The question was, was there, um, a decision that, you know, dealing with the other goods that they, they wouldn't be shipped to Mexico until payment was made or something that that's where, uh, I think the court found that there was an intent to defraud. Right. But the facts show that, uh, she did ship them to Mexico. Um, and she, she never did really release the goods to the buyers. Um, so, so the court held that she intended to release the goods to the buyers, which she never did. You're challenging his finding, which was based on the credibility of the witness testimony. Um, I think we had documentary evidence to support, uh, that she did not release the goods to the buyers. We had, um, the process was that she, uh, would release the goods to the, uh, customs broker. And then the buyers had time to process the merchandise by, uh, removing foreign language labels from the tags, which is what she testified to. And that then the customs broker then would arrange for export to Mexico. And so the fact show that she actually did not, uh, deliberately, uh, release goods to anybody. And, and, and that she didn't intend to do so at the outset. She intended to repay the note, which is the other court. But that's, those are not necessary, um, things that go together. She can have intended to pay the note, correct. But she, you know, if the, the trial court's ruling is correct, she, uh, she may have intended to pay the note, but she didn't intend to fulfill the agreement and hold on to the collateral, uh, until she received the money. That's, those are two different things, are they not? Um, I don't, I don't think they're, I, I, I, I don't think so. Um, because repaying the note would be, would mean getting payment from the clients or from the buyers. Um, I, I don't think they're different. All right. Thank you. Okay. Would you like to reserve the rest of your time or do you have more you want to say at this point? Well, plaintiff makes a big deal about them taking goods from the warehouse, the buyers taking goods from the warehouse without permission and her not reporting it. The, uh, plaintiff was the one in, in the driver's seat here. But my argument is the plaintiff had nothing to do with the deal. He was writing a promise argument, right? He didn't get involved in the deal until later on. Um, so all of this stuff about she had to have his permission to do anything, um, is, is silly. He... Wasn't that written down in the security agreement? It was a condition, was it not? That's not silly, is it? The trial court incorrectly held that. There was nothing in the promissory note that indicated that she would have to receive his permission. He was hands off. This was just a note to loan her money. She was to do everything. Um, it wasn't material about, they, they made up, they had to fabricate a bunch of material factors in order to do the adversary proceeding as discussed in my reply to their opening brief. So what, what they, what the plaintiff was claiming was material didn't really become material until the adversary proceeding. Okay. You want to reserve the rest of your time? Yes. Okay. Very good. Thank you. Mr. Knox, please go ahead. I'm on your honors. Thank you very much. Uh, each of you has asked the precisely relevant questions to this matter, uh, starting with the actual, uh, standard by which this has reviewed. It is in fact, uh, clear error is the standard. And obviously plaintiff cannot meet the standard of clear error. She's effectively hoping that this court will retry the case. And that's not the appellate court's role to retry the case. As your honor correctly observed, the trial court below made its determination based on the credibility and the feasibility of the appellant story, which the appellant story just was not credible. Uh, the dispute as you've gathered is a fraud case. Her debt was seen non-dischargeable as a result of that fraud. Uh, it sounds like your honors have a good grip on the actual facts of the case. Uh, our client having provided financing for a particular goods and those goods constitute his collateral. Uh, all of the evidence in the record establishes that the appellant, in fact, voluntarily released those goods voluntarily released as collateral. You heard Ms. Flores say just now that she thinks that there's documentary evidence in the record that showed that the appellant did not release the goods. She's wrong. She didn't say to any now, and she couldn't say to any in the trial court below to the contrary, the only documentary evidence in the record and it's dispositive and it's upon which the trial court relied or the communications that the appellant sent nearly immediately after executing the deal with our client, where she in fact instructed that the documentation that would have been required for the warehouse to release the goods to the buyers, that that documentation be provided such that the goods could be released. The documentation that's, uh, in our supplemental excerpts of record, I believe pages 21 through 23, uh, is correspondence that was in September and October of 2017. That's what the trial court was referencing when it said that there are emails that quote unquote, the lie plaintiff story that she didn't authorize the goods release. Uh, she was hoping that the matter would work out. She was attempting to rob Peter to pay Paul and hope that it would work out in the end. She hoped that she would ultimately be able to Peter. She ultimately was not, it didn't work out the way that she hoped it would, but the fact was that she made the misrepresentation at the outset of the party's transaction as a trial court correctly filed. Uh, your honor asked a correct question and it's fascinating and somewhat jarring to hear counsel's quite candidly misrepresentation of the document. Uh, she claims both in her brief and even in the oral argument today, I'll read you from your brief. She said that the promissory note quote, contained no promise that debtor agreed to obtain creditor's consent in writing before releasing the goods nor the tiger trade. And that's that his company would not release the goods until after it was paid for the collateral. That's an appellate's opening brief page eight as your honor asked, doesn't the deal explicitly say that short answer is yes, the deal explicitly says that paragraph three of the promissory note provides quote, until payment in full under the note, company will not without lender's written consent, exchange, lease, lend, use, sell, or dispose of the collateral or the company's rights therein. She was prohibited from releasing the goods. There could not be a more clear written indication that she was prohibited from releasing the goods. She released the goods. I'd like to jump you ahead a little bit and ask you about the question of interest. What confuses me about this case is we start off with a judgment from the district court, basically liquidating the amount of money owed under this note that bears interest at the rate applicable to that judgment, which I think was something like 1.7, 1.8%, somewhere in that vicinity. But then the bankruptcy court, a few years later, entered its own judgment on the same debt for the same amount minus payments at a higher rate. I think it was 5.8% as pre-judgment interest. And I'm confused by the fact that we have post-judgment interest and pre-judgment interest running on the same obligation over the same time period at two different rates. Can you help me clear that up? The interest rate of pre-judgment interest was awarded on the underlying judgment, the underlying judgment being the judgment from the district court. On the applicable rate for the judgment as it was entered in the bankruptcy court, that rate does adjust pursuant to statute based on, and I'm pulling up the language right now. No, I'm aware of that. It's more of a practical problem of entering pre-judgment interest on an obligation that's already bearing interest at a different rate. See what I'm saying? We have the district court judgments bearing interest at 1.8%, then the bankruptcy court goes sort of backwards and rules that it accrued interest at 5.8% before the bankruptcy court's judgment was entered. Well, the bankruptcy court's judgment was based on the interest starting to accrue from the entry of the district court's judgment. The pre-judgment interest that the district court would have accrued would have been up to that point, and then the interest thereafter would have been from that date and time from the district court's judgment. I'm actually asking about the post-judgment interest on the district court's judgment, because that judgment bore interest post-judgment at the statutory rate, which then was 1.8%, give or take, but then the bankruptcy court says, no, it's actually 5.8%. I'm not sure how the bankruptcy court justified that change of the interest rate during the same period between the entry of the district court judgment and the entry of the bankruptcy court judgment. The pre-judgment interest, and I can see where there could be a bit of a conflict between pre-judgment being the bankruptcy court and post-judgment being the district court. We would argue that the bankruptcy court's determination on that, based on the time that accrued in between those two dates, is the operative amount. It obviously does present a bit of a complex situation when you are dealing with two judgments. But the short answer is that the bankruptcy court being the later judgment, that determination of interest in that calculation appropriately trumps the preceding calculation. Okay. All right. Anything else you'd like to add? I kind of jumped you out of sequence. I'm sorry, but I wanted to make sure I got my question in Okay, that's fair. And you did. And I think that where I left off was discussing the fact that the appellate clearly intentionally authorized the release of the goods, despite the fact that she's arguing that she did not do that. She clearly was prohibited from doing so under the plain language of the agreement, despite the fact that she's somehow arguing that that was not, in The court focused, and there was a good amount of discussion in the district court regarding bills of lading and a telex release, which is the documentation that was necessary for affecting the release of the goods. That was one of the factual disputes. As the briefs discuss, those documents authorized the goods release. Appellant, again, argues, and this speaks to her credibility and, frankly, her understanding of the case, that the requirement to turn over to plaintiff the bills of lading was, quote, was never a part of the final agreement because plaintiff did not request it to be. And again, much like with the other provision that we were just talking about, the contract unambiguously required the appellant to turn over the bills of lading. The contract unequivocally says the container numbers and the bills of lading will be provided to lender upon shipping. Yet she disputes the fact that she had this obligation. This is the equivalent of lying about the weather. You can confirm by looking at the document that she had this obligation to do so. Throughout the trial court proceedings and here, she attempts to blame the victim for the fact that he was essentially robbed. She said the creditor never asked for the bills of lading, as if that somehow absolves her of her obligation to provide the bills of lading. It does not. And instead of providing the bills of lading to the plaintiff, she provided the bills of lading and the appropriate documentation with respect to the Telus release. She provided all of that to the warehouse and to the buyers, authorizing the warehouse to release the goods to the buyers. And that clearly ran afoul of the express plain language of the contract. She's now arguing that that plain language of the contract somehow was, quote-unquote, not material. Holding on to the collateral that was the plaintiff's ability to get paid is potentially the most material aspect of the entire transaction. So it's difficult to come up with a response for how far off the argument could be that this is somehow not a material term of the agreement. It was. She denies having instructed that the release of the goods, the sequence of events that I just described, where she did authorize that the court came to a correct conclusion, reading the evidence that was in front of it, and that conclusion was not clear error, as would be required for this court to actually overturn that ruling. The ruling was correct and the ruling was a matter of common sense. Even upon her own cross-examination with respect to the documentation that would have been required for the release of the goods, appellant said of the warehouse, quote, they had the documentation. They just needed the authorization from me, unquote. Yet she continues to deny that she authorized the release of the goods. She did not protest the release of the goods. As she notes, the trial court makes a big deal out of the fact that she didn't protest the release of the goods. She didn't report the supposed unauthorized release of the goods to the police. She didn't report it to the police. She didn't report it to customs. She didn't tell anybody because she authorized the release. There was nothing to tell. Now she's saying that she didn't, and it's clearly a fabrication. The trial court clearly didn't believe it. More tellingly, she doesn't point to any evidence of her having made any protests or complaints. She doesn't point to any evidence of her having demanded payment for the goods that were supposedly robbed from her. The goods weren't robbed from her. The goods weren't released without authorization. She authorized the goods release. And again, she blames the victim for that, arguing that she didn't tell the authorities or didn't complain to the supposed culprits or didn't tell her insurance carrier because the plaintiff didn't tell her to, as if it was the plaintiff's obligation to cause all these things to happen when it was only his role in the matter to receive the money that he had lended. So this is a clear indication on all fronts, all the evidence that's in front of us, that A, that Appellant authorized the release of the goods and that she had the intent to do that from nearly the outset of the party's transaction, which was sufficient to establish her lack of intent to perform under the party's agreement. She knew that trouble was brewing, was the trial description of it, and the evidence in the record clearly establishes that trouble was brewing because the Mexico-based buyers were having trouble moving the missed 60 goods. The missed 60 goods that she tried to dump off on plaintiff, and plaintiff had no obligation to take those goods. Those goods weren't a part of the deal. And contrary to what she said a moment ago in her oral argument, and she said in her papers, and this is a key point, the expert testimony that she sought to offer on the issue of the value of the missed 60 goods absolutely was not relevant. And the value of the missed 60 goods, despite what she said just now, absolutely was not dispositive of anything that the trial court ruled on. The trial court specifically said that the value of those goods is neither here nor there because the plaintiff did not have an obligation to take those goods. The plaintiff's only role in this was to get paid the money that was owed, and that was the end of it. He had no obligation to take those goods and their value was not the proper subject of any evidence and particularly not the proper subject of expert testimony, which by the way, Appellant is referring to as rebuttal expert testimony, but plaintiff didn't offer any expert testimony on this issue. So there was nothing to rebut because this was not a relevant issue and it certainly was not dispositive of the trial court's ruling. With that, I see that I only have a minute left. I'd like to reserve that minute. Okay, any questions for Mr. Nelson? Okay, thank you very much. Ms. Flores, back to you for rebuttal. But your honor, the testimony that those goods were worthless was dispositive in the ruling because that's how she knew trouble was brewing. That her partner, her Mexican buyer partners, were having trouble moving the goods and they keep talking about robbing Peter to pay Paul. The Tiger Trade co-owned goods with the Mexican buyers, so about a third of those goods that were valued at three million dollars, Tiger Trade co-owned. So why would you go to the hassle and effort of coming up with a whole new shipment when they could just have given her their portion of the goods to begin with? There was a global release of the goods just because a Mexican, they can't sell high-end denim jeans worth $110 a piece in Mexico doesn't mean that she couldn't have sold them around the world. So there was no robbing of Peter to pay Paul. She also used the money to pay for the goods and ship the goods to the United States. Now let's just assume for argument's sake that she went ahead and released the goods that earlier on. That doesn't mean that the time she made the contract she intended to defraud plaintiff. Intent to defraud has to be at the time you make the contract. It can't be later on and she did what plaintiff asked her to do. He was an expert in the off-price industry and the court would not allow rebuttal testimony that it's standard practice in the off-price industry to offer goods, merchandise in lieu of monetary payment. And that's what happened. And she did what he told her to do. He said as of December, I believe he said it was still early in the deal. And she had no reason to visit the warehouse. She had an ongoing successful relationship with them. And I think that she had no reason to visit the warehouse or inspect anything. So she did not know that they had taken it. And the plaintiff did not instruct her to report this to anybody. He went ahead and with the blessing of his own attorney, which speaks to the fact that paying in merchandise is standard practice. With the blessing of his own attorney, he tried to move the goods for quite a while. And as late as April of the following year, some seven, eight months later, the Mexican buyers were still talking about the goods. So it's illogical that the court found that the buyers were really upset that early on when in April, they were still talking about it in an email that was in one of my exhibits. I can't access my computer too easily here, but I have the email where she's asking, I think it's April of 2018 to Benny Amiga, one of the Mexican buyers, what's this worth now? And he said $625 a piece. So that's not worthless. So again, the judge is finding the fact that goods were worthless is dispositive and knowing that, quote unquote, trouble was brewing. So it's just to me, even if she deliberately released the goods, that's not really speak to fraud and the inducement. This was a contract, nothing more. And worse, she breached the contract. I reserve remaining time to rebut anything else that Mr. Knox might say. Okay. Well, that's the end of the argument. So there'll be no more rebuttal. Any questions from the panel? No. Okay. Thank you very much. The matter is submitted and we'll be issuing a written decision. Thank you. Thank you, Your Honor. Thank you, Your Honor.
judges: FARIS, BRAND, and CORBIT